**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

**RAYMOND LEE CRISS,**

          Plaintiff,

**v.**

       **CIVIL ACTION NO.: 5:16-CV-86
(JUDGE STAMP)**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

          Defendant.

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On June 16, 2016, Plaintiff Raymond Lee Criss ("Plaintiff"), through counsel Travis M. Miller, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin,[1] Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On August 17, 2016, the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 6; Admin. R., ECF No. 7). On September 15, 2016, and October 14, 2016, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment and supporting briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 12). Plaintiff filed a Response to Defendant's Motion on October 18, 2017. (ECF No. 14). The matter is now before the undersigned United

---

[1] The undersigned notes that, on January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II. <u>PROCEDURAL HISTORY</u>

On September 18, 2012, Plaintiff protectively filed a Title XVI claim for supplemental security income ("SSI") benefits, alleging disability that began on September 18, 2012. (R. 15, 177). Plaintiff's claim was initially denied on January 24, 2013, and denied again upon reconsideration on April 18, 2013. (R. 85, 98). After these denials, Plaintiff filed a written request for a hearing. (R. 113).

On October 3, 2014, a hearing was held before United States Administrative Law Judge ("ALJ") Terrence Hugar, in Morgantown, West Virginia. (R. 15, 33, 125). Plaintiff, represented by counsel, Travis M. Miller, Esq., of Travis Miller Attorney at Law, PLLC, appeared and testified in Morgantown, West Virginia. (R. 15, 48). Keith R. Holan, M.D.,[2] an impartial medical expert, also testified at the hearing, as well as Larry Ostrowski, Ph.D., an impartial vocational expert. (R. 15, 37-74). On October 30, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 28). On April 20, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

---

[2] Dr. Holan's name is incorrectly spelled "Holman" in the transcript of the ALJ hearing on October 3, 2014. (<u>See</u> R. 33-75).

### III. <u>BACKGROUND</u>

**A.   Personal History**

Plaintiff was born on February 17, 1968, and was forty-four years old at the time he filed his claim for SSI benefits. (R. 193). He is 5'6" tall and weighs approximately 300 pounds. (R. 197). He is single and lives alone in a house that is near his mother's home. (R. 53, 214). He obtained a general equivalency diploma in 1986. (R. 198). His past work includes working as a construction worker and cemetery worker. (R. 26, 65-66). He alleges that he is unable to work due to the follow ailments: (1) hypertension; (2) edema; (3) dyspnea; (4) morbid obesity; (5) nicotine dependence; (6) chronic obstructive pulmonary disease ("COPD") and (7) lower back pain. (R. 197).

**B.   Medical History of Edema**

**1.   Medical History Pre-Dating Alleged Onset Date of September 18, 2012**

In July 2012, prior to Plaintiff's alleged disability onset date, Plaintiff presented to James Namsupak, M.D., a primary care physician, with complaints of swollen legs for four to five days. (R. 289). According to the intake notes, Plaintiff reported that the leg swelling had been going on for the past two years and that he took Lasix once a day. (Id.). Plaintiff began taking an increased dosage of Lasix three days earlier, but it did not control the swelling. (Id.). Plaintiff had 2+ pitting edema, but no sensory or motor deficits. (Id.). Dr. Namsupak discontinued Lasix and added Demadex (a diuretic medication) and Klor-con. (Id.). The records also indicated that Plaintiff smoked one pack of cigarettes per day for the last thirty years. (Id.).

At two follow-up appointments later in July, Plaintiff reported that Demadex was working but he had bilateral pitting edema at one of the appointments. (R. 285, 286). Dr.

Namsupak increased Plaintiff's Demadex dosage and added Spironolactone and stressed that Plaintiff must decrease his sodium intake (R. 285).

By August, Plaintiff improved some but still had bilateral 1+ pitting edema. (R. 284). In mid-August, Plaintiff returned to Dr. Namsupak after going to the emergency room for swelling. (R. 283). Plaintiff reported compression stockings helped. (Id.). Dr. Namsupak increased Plaintiff's dosage of Spironolactone and continued Demadex. (Id.). Dr. Namsupak, in a letter dated August 3, 2012, stated that Plaintiff could not work at this time but that he should be able to handle exertion more easily once his swelling and medical problems were under control. (R. 280). At an appointment on September 6, 2012, Plaintiff stated that he continued wearing compression stockings, which helped, and Dr. Namsupak noted no edema on examination. (R. 282). Plaintiff continued to smoke despite being repeatedly advised to stop and Plaintiff had gained six pounds when he had been instructed to lose weight. (R. 282-86).

### 2. Medical History Post-Dating Alleged Onset Date of September 18, 2012

At the start of the relevant period, in September 2012, Plaintiff established primary care with Himanshu Paliwal, M.D., and complained about progressing pedal edema. (R. 295). In September and October, Plaintiff had 2+ leg swelling but palpable pedal pulses. (R. 294-95). Dr. Paliwal diagnosed Plaintiff with peripheral venous insufficiency, discontinued Spironolactone and Demadex and prescribed Triamterene and compression stockings. (R. 293, 294). At a follow-up visit in November, Plaintiff had bilateral leg swelling but palpable pedal pulses. (R. 556).

At the end of November 2012, Plaintiff was briefly hospitalized for shortness of breath, syncope and an irregular heart rate. (R. 311). A permanent pacemaker was

implanted, and Plaintiff improved. (Id.). On admission, Plaintiff had 3+ edema of his extremities but no cyanosis. (R. 319). Plaintiff was prescribed Lasix and Demadex while admitted. (R. 321). On discharge, Plaintiff had no edema and was continued on Lasix. (R. 429, 431). At a follow-up appointment for his pacemaker in December 2012, Plaintiff reported that Lasix was "not working" and that he had edema in his legs and shortness of breath. (R. 533).

A few days later, Plaintiff saw physician assistant Ned Hess, PA-C, an associate of Dr. Paliwal, for an acute exacerbation of COPD, and he was instructed, among other things, to rest and elevate his feet. (R. 555). No edema was noted at this visit or a follow-up visit three days later. (R. 554-55).

At the end of December 2012, Sushil Sethi, M.D., performed a consultative examination of Plaintiff that revealed no edema or cyanosis, a normal gait, good range of motion and full strength. (R. 536, 539-40). Plaintiff also could heel and toe walk and squat. (R. 536).

Plaintiff returned to his primary care provider, PAC Hess, in January and February 2013. (R. 548, 551). In January, Plaintiff reported to PAC Hess to have his meds checked and to be scheduled for a sleep study. (R. 551). PAC Hess notes that Plaintiff is a "[w]ell appearing, alert, obese male, no acute distress." (Id.). He further notes "mild to moderate pitting edema in his lower legs" despite taking Lasix and Spironolactone. (Id.). PAC Hess encouraged Plaintiff to wear his compression stockings, avoid sodium and keep his legs elevated "at rest and bedtime." (Id.). In February, Plaintiff reported losing some weight, increasing his activity and watching his diet. (R. 548). Plaintiff was not wearing his compression stockings as often as

recommended, but he was trying to keep his legs elevated and avoid sodium. (Id.). Plaintiff reported that "there [were] days when he still [had] a lots of swelling." (Id.). On examination, Plaintiff only had "[m]ild pitting edema in the lower legs." (Id.). PAC Hess stated that he "just [did] not feel comfortable to keep pushing the diuretics and the best thing he could do would be to become more active and watch his sodium intake while keeping the legs elevated." (Id.). Additionally, PAC Hess encouraged Plaintiff to wear his compression stockings as much as possible (Id.). Plaintiff also had edema on examination during an evaluation for sleep apnea in February, 2013. (R. 571).

Plaintiff began seeing David Tingler, M.D., for pacemaker monitoring in April 2013. (R. 580). Plaintiff had only trace edema in both legs and no cyanosis. (R. 581). At a pacemaker monitoring appointment with Dr. Tingler in October 2013, Plaintiff reported having "rare lower extremity swelling" and had "no edema" on examination (R. 582-83).

Plaintiff returned to his primary care provider for routine follow-up appointments in May, September and December 2013. (R. 639-46). Plaintiff continued to take Lasix and Spironolactone. (R. 639-40, 642). Plaintiff reported that his venous insufficiency was not "bothering him as much." (R. 639). In May and September 2013, he had minimal pitting edema in his lower legs. (R. 639-40, 642). In December 2013, Plaintiff reported some lower extremity edema "at times" but had no edema on examination. (R. 644-45). None of his primary care providers made any further recommendation for Plaintiff to elevate his legs. (R. 639-46).

In March 2014, Plaintiff reported to his primary care provider, Heather Vincent, PA-C, that he was doing well. (R. 648). Plaintiff had no complaints about edema, and no

edema was noted on examination. (R. 649). No changes were made to Plaintiff's medications. (R. 650).

When Plaintiff returned to Dr. Tingler in May 2014, he requested refills of his diuretic mediation and reported "stable lower extremity edema." (R. 584). On examination, Plaintiff had 1+ non-pitting edema. (R. 585). Dr. Tingler noted Plaintiff was doing well and his current medication regime was effective. (R. 585). He refilled Plaintiff's Lasix prescription and discussed the importance of diet, exercise and weight control. (R. 585).

At a follow-up appointment with his primary care provider in July 2014, Plaintiff had no complaints of edema and had no edema on examination. (R. 652-53). Plaintiff continued to take Lasix and Spironolactone and tolerated all his medications without side effects. (R. 651).

There is no comment by either Plaintiff or medical health care providers throughout Plaintiff's medical records that he suffers from frequent urination as a result of his prescribed diuretics. In fact, on October 1, 2012, Plaintiff interviewed with S. Mick from social security field office who reported physical observations of Plaintiff during an hour interview and there is no indication that Plaintiff had to leave to urinate during that time. (R. 194). Likewise, the Disability Determination Examination performed by Dr. Sethi did not indicate any interruptions for urination by Plaintiff during the exam. (R. 535-537).

### 3. Medical Reports/Opinions

#### a. Disability Determination Examination by Sushil M. Sethi, M.D.

On December 31, 2012, Sushil M. Sethi, M.D., a state agency medical consultant, performed a Disability Determination Examination of Plaintiff. (R. 535-537). This Disability Determination Examination consisted of a clinical interview and physical examination of Plaintiff. (Id.). During the clinical interview, Plaintiff informed Dr. Sethi that he suffers from hypertension, edema and shortness of breath. (R. 535). With regard to those impairments, Plaintiff indicated that he used to smoke two packs a day but quit over one year ago and currently rubs snuff, one can every two days. (Id.). Plaintiff also complained of low back pain that started a few years ago. (Id.). Plaintiff reported that on November 27, 2012, he received a pacemaker and that the "swelling in his legs went away right away." (R. 535-36). With regard to alcohol, Plaintiff stated that he used to drink a twelve pack everyday but no longer drinks. (R. 536).

After the clinical interview, Dr. Sethi performed a physical examination of Plaintiff. (R. 536). Generally, Dr. Sethi noted that "[t]he patient is well built, well nourished, and in no acute distress." (Id.). As for his extremities, the Doctor noted "[l]ower extremities show no edema, no cyanosis, and no clubbing of toenails . . . ." (Id.). Dr. Sethi further noted that "[h]e is able to walk on tiptoes and heels. He can squat, Gait on the level surface is normal. . . . There is no tendonitis, bursitis, or synovitis of the joints. . . . Shoulders show bilateral normal range of motion. . . ." (Id.).

After completing the clinical interview and physical examination of Plaintiff, Dr. Sethi impressions were: (1) moderate obstructive pulmonary disease; (2) a recent permanent pacemaker possibly related to cardiomyopathy; (3) hypertension; (4) history

of COPD used to smoke two packs of cigarettes a day and (5) chronic low back pain. (R. 537). Dr. Sethi's medical source statement was that "[t]he claimant's ability to work at physical activities may be moderately limited. Hearing and speaking are normal." (Id.).

### b. Disability Determination Explanation by Rabah Boukhemis, M.D., January 23, 2013

On January 23, 2013, Rabah Boukhemis, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 76-84). Prior to drafting the Initial Explanation, Dr. Boukhemis reviewed the evidence of record (R. 77-78). Dr. Boukhemis determined that Plaintiff is a forty-four-year-old male with a twelfth-grade education and a one-year work history. (R. 79). Dr. Boukhemis concluded that his medical determinable impairments were COPD, obesity, essential hypertension and spine disorders. (R. 80).

In the Initial Explanation, Dr. Boukhemis completed a physical Residual Functional Capacity (RFC) Assessment of Plaintiff. Dr. Boukhemis found Plaintiff possessed the following exertional limitations: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with the same limitations as lift and carry. (R. 81). Plaintiff's postural limitations are as follows: he can occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds; can balance and stoop frequently and can occasionally kneel. (R. 81).

Additionally, he indicated that "the individual's statement about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by

the objective medical evidence alone." (R. 80). Dr. Boukhemis ultimately determined that Plaintiff was not disabled. (R. 84).

### c. Disability Determination Explanation by Fulvio Franyutti, M.D., April 16, 2013

On April 16, 2013, Fulvio Franyutti, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 86-97). Prior to drafting the Reconsideration Explanation, Dr. Franyutti reviewed all the medical evidence of record. (R. 87-90). After reviewing these documents, Dr. Franyutti concluded that Defendant was not disabled. (R. 96).

In the Reconsideration Explanation, Dr. Franyutti completed a physical RFC assessment of Plaintiff. (R. 92-94). Dr. Franyutti found that Plaintiff is able to : (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with the same limitations as lift and carry. (Id.). Plaintiff's postural limitations are as follows: (1) can occasionally climb ramps and stairs; (2) can never climb ladders, ropes or scaffolds; (3) can balance and stoop frequently; (4) can occasionally kneel and crouch and (5) can never crawl. (Id.).

Additionally, Dr. Franyutti indicated that "the individual's statement about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence alone." (R. 92). He further indicates that the treating source opinion "relies on the subjective report of symptoms and

limitations provided by the individual, and the totality of the evidence does not support the opinion."[3] (R. 95).

**Testimonial Evidence**

**1. Medical Expert Testimony**

Medical expert Keith Holan, M.D., testified at the hearing after reviewing Plaintiff's complete record (R. 37-47). Dr. Holan opined that:

> [Plaintiff's] limitations would include occasionally lift and carry [twenty] pounds, frequently lift and carry [ten] pounds. Stand or walk for six hours in an eight hour day, sit for six hours in an eight hour day. Unlimited pushing and pulling. Postural limitations, the claimant could occasionally climb ramps and stairs, never climb ropes, ladders or scaffolds. He could occasionally balance, stoop, kneel, crouch and crawl. There are no manipulative, visual or communicative limitations. Environmental limitations would include avoiding concentrated exposure to temperature extremes, pulmonary irritants and noise.

(R. 41-43). Dr. Holan explicitly stated that Plaintiff had no other functional limitations. (R. 41).

In response to follow-up questioning, Dr. Holan stated that elevating the legs above the level of the heart and diuretic medication are common treatments for edema. (R. 43). Dr. Holan stated that diuretic medication is expected to decrease edema and that increased urination is an intended effect of diuretic medication as it causes the kidneys to "put out more water in the blood." (R. 44-5). Dr. Holan explained that an individual would have to urinate frequently after first starting the medication but that an individual would adjust to the medication in several weeks and then would only urinate slightly more than someone who was not taking the medication depending on their level

---

[3] Dr. Franyutti references John Manchin Healthcare Center opinion dated December 3, 2012, as a treating source opinion. (R. 92). In reviewing the file, it appears that the date of the opinion was August 3, 2012, prior to the onset date. (R. 280). The treating source opinion is a letter by Dr. James S. Namsupak stating that Plaintiff is unable to work at this time until his swelling and medical problems are under better control. (R. 280).

of edema. (R. 45-6). Upon cross-examination, Dr. Holan further testified that different patients respond differently to diuretic medication and that it is possible someone could urinate more frequently than he noted. (R. 48).

### 2. Plaintiff's Testimony

In connection with his application for SSI benefits, Plaintiff reported that his legs swelled when "on them too much." (R. 214). Later, he reported that his legs swelled during the day and that he had to elevate his feet. (R. 235). He further noted that his fluid pill made him urinate frequently, which was the intended effect of this medication. (R. 242). At the hearing, Plaintiff testified that he continued to have swelling in his legs and that his treatment included diuretic medication, compression stockings and leg elevation. (R. 57). Plaintiff reported that his compression stockings helped but that he does not wear them all the time, he elevates his feet four hours a day and he urinates every fifteen minutes due to his diuretic medication. (R. 57-60).

## C. Vocational Evidence

### 1. Vocational Testimony

The Vocational Expert ("VE") at the hearing was Dr. Ostrowski. The ALJ asked the VE to consider an individual with Plaintiff's vocational background and RFC assessment for light work involving occasional climbing of ramps and stairs but never climbing ropes, ladders or scaffolds; occasional balancing, stooping, kneeling, crouching and crawling; no exposure to hazards such as unprotected heights and moving mechanical parts; no concentrated exposure to extreme temperatures, wetness, humidity and vibration and no exposure to loud or very loud noise. (R. 66-67). The VE testified that such an individual could perform the representative light jobs as an office

helper, marker and mail clerk and sedentary jobs as a document preparer, ampoule sealer and surveillance system monitor. (Id.). The VE also explained that an individual could perform the representational jobs even if they took up to six minutes an hour for restroom breaks in addition to the three scheduled breaks per workday but not if they took two five-minute bathroom breaks per hour. (R. 71-72). The VE also testified that an individual could not perform the representational jobs if they need to elevate their legs above their heart during working hours. (R. 73).

### 2. Disability Reports

On or about October 1, 2012, Plaintiff interviewed with S. Mick, who filed a Disability Report–Field Office. (R. 193-195). Interviewer S. Mick noted the following observations:

> The claimant came into the interview accompanied by his mother. He had wheezing and labored breathing for the first twenty minutes of the approximately 1 hour interview. His breathing settled down a little after sitting down for about a half hour. He walked slowly and favors his lower back. He got up stiff from sitting through the interview. He walked out slow. He had problems answering some questions pertaining to dates but appeared to estimate them well. Nothing else unusual detected during the hour-long interview.

(R. 194).

That same date Plaintiff submitted a Disability Report-Adult. (R. 196-205). In this report, Plaintiff indicated that he is unable to work due to the following conditions: (1) hypertension; (2) edema; (3) dyspnea; (4) morbid obesity; (5) nicotine dependence; (6) COPD and (7) lower back pain. (R. 197). Plaintiff further indicated that he stopped working on March 1, 2007, because he was laid off but was unable to return to working beginning September 1, 2012, because of the above listed conditions. (R. 197). He listed Advair diskus, atenolol, furosemide, potassium chloride, prednisone,

spironolactone, torsemide and tramadol as his prescribed medications. (R. 200). The
torsemide and furosemide are listed as the medication for fluid problems. (Id.). Plaintiff
did not claim any mental conditions nor did he mention frequent urination being a
problem. (Id.).

**D.     Lifestyle Evidence**

**1.   Adult Function Report, October 12, 2012**

On October 12, 2012, Plaintiff, with the help of Carolyn Criss, his mother,
submitted an Adult Function Report. (R. 214-221). In this report, Plaintiff states that he
lives in a house alone. (R. 214). He further states that he is unable to work because he
cannot breathe with exertion; his back hurts; he cannot lift anything and his legs swell
when he is on them too much. (Id.).

Plaintiff discloses that he is limited in some ways but not in others. In several
activities, Plaintiff requires no or minimal assistance. He is able to perform his own
personal care, although he experiences difficulty bathing and dressing because his back
hurts, he gets out of breath and cannot stand for too long. (R 215). He is able to prepare
his own meals, which include sandwiches, beans, soups, chili, potatoes and spaghetti.
(R. 216). He is able to cook, clean, sweep floors and mow the lawn with a riding lawn
mower. (Id.). Plaintiff has never had a driver's license; therefore, he cannot drive but is
able to walk. (R. 217). He shops for food and household supplies approximately two
times a month for one to two hours at a time. (Id.). He is able to pay his own bills, count
change and handle a checking and savings account. (Id.).

While Plaintiff is able to perform some activities, he describes how others prove
more difficult due to his pain and physical impairments. Plaintiff's pain/physical

impairments affect his ability to: lift, squat, stand, bend, reach, walk, kneel, climb stairs and complete tasks. (R. 219). He explains that he cannot breathe while doing these activities and his legs hurt if he stands too long. (Id.). He estimates that he is able to walk only thirty to forty feet before needing to rest. (Id.). His physical impairments and pain also interfere with his ability to sleep. (R. 215). Plaintiff does not claim any mental impairments. (R. 219-20).

Plaintiff does not mention frequent urination as a limitation caused by his injuries. (R. 214).

### 2. Adult Function Report, March 13, 2013

On March 13, 2013, Plaintiff, with the help of Travis Miller, his attorney, submitted an Adult Function Report. (R. 234-232). In this report, Plaintiff states that he lives in a house alone. (R. 235). He further states that he is unable to work because he is "very short of breath;" he has chest pain at times and low back pain with activity; his legs swell during the day; he has to elevate his feet and lastly he is very tired and he falls asleep during the day due to sleep apnea. (Id.).

Plaintiff describes his typical day as getting up, having breakfast and watching television. (R. 236). Depending on how he feels that day, he may try to do some things around the house but he can only do them for a short time. (Id.). He falls asleep a lot. (Id.). Plaintiff is able to perform his own personal care, although he experiences difficulty bathing and dressing because he has to sit down. (Id.). He is able to prepare his own meals, which includes soup and frozen foods. (R. 237). He is able to pick up around the house when he feels good. (Id.). He does not do chores if he does not feel good. (Id.). He mows the lawn in the summer on a riding lawn mower when he feels good. (Id.).

Plaintiff has never had a driver's license; therefore, he cannot drive but is able to walk. (R. 238). He shops for food and household supplies when he is able. (Id.). It is difficult to get around the store because he has to sit and rest. (Id.). He is able to pay his own bills and handle a savings account. (Id.). Plaintiff states that he does not count change and has never had a checking account but he does get money orders at times. (Id.).

While Plaintiff is able to perform some activities, he describes how others prove more difficult due to his pain and physical impairments. Plaintiff's pain/physical impairments affect his ability to: lift, squat, stand, bend, reach, walk, kneel, climb stairs and complete tasks. (R. 240). He explains that when he tries to do physical items, he gets short of breath and his back hurts. He is very tired most of the time and this affects his memory and concentration. (Id.). He estimates that he is not able to walk very far. (Id.). He has sleep apnea. (R. 236). Plaintiff does not claim any mental impairments. (R. 235-242). Plaintiff does not mention frequent urination as a limitation caused by his injuries. (Id.).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> [The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses

the following five-step sequential evaluation process to determine whether a claimant is

disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement [of twelve months] . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

> (iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the

claimant to prove that he or she is disabled and that, as a result of the disability, he or

she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d

802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the

Commissioner at step five to demonstrate that jobs exist in the national economy that

the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir.

1968). If the claimant is determined to be disabled or not disabled during any of the five

steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation

process, the ALJ found that:

1.    The claimant has not engaged in substantial gainful activity since September 18, 2012, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: chronic obstructive pulmonary disease; obstructive sleep apnea; diabetes mellitus; hypertension; hyperlipidemia; hearing loss; report of peripheral neuropathy; and obesity(20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 416.967(b) except the work: with occasional posturals, except no crawling or climbing of ladders, ropes or scaffolds; no exposure to hazards such as unprotected heights and moving mechanical parts; no concentrated exposure to extreme heat, extreme cold, wetness, humidity, and vibration; and, no exposure to loud or very loud noise.

5.    The claimant is unable to perform any past work (20 CFR 416.965).

6.    The claimant was born on February 17, 1968 and was 44 years old, which is defined as a younger individual age 18-49, on the date the application was filed. (20 CFR 404.1563 and 416.963).

7.    The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled,"

whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since September 18, 2012, the date the application was filed (20 CFR 416.920(g)).

(R. 15-28).

## VI.   DISCUSSION

### A.   Contentions of the Parties

In his Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision is contrary to the law and is not supported by substantial evidence. (Pl.'s Mot. at 1, ECF No. 10). Specifically, Plaintiff contends that the ALJ: (1) failed to properly consider the medical expert's testimony related to Mr. Criss' two most disabling impairments and (2) failed to properly consider the vocational expert's testimony indicating no jobs existed for an individual with Mr. Criss' limitations. (Pl.'s Br. in Supp. of his Mot. for Summ. J. ("Pl.'s Br.") at 1, ECF No. 11). Plaintiff requests that the Court either remand to the Commissioner for calculation of benefits or for further proceedings. (Id. at 9).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence and the ALJ applied the law correctly. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that the ALJ: (1) properly considered Dr. Holan's testimony regarding the general treatment of edema and generally the frequency of urination related thereto and

determined that with regard to Plaintiff, these limitations were not credible and (2) properly relied on the VE's testimony to the extent that edema and frequent urination were not credible limitations to the degree Plaintiff alleged based on the record as a whole. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 11, 12, ECF No. 13). Defendant further contends that both the credibility assessment and the RFC determination are supported by substantial evidence. (Id.). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1, ECF No. 12).

**B.    Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." (Id.) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court

must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

## C.    Analysis of the Administrative Law Judge's Decision

### 1.    The ALJ Properly Assessed Plaintiff's Credibility regarding Edema and Frequent Urination due to his Diuretic Medication

Plaintiff argues that the ALJ erred by: (1) failing to properly consider the medical expert's testimony at the hearing related to Mr. Criss' two most disabling impairments and (2) failed to properly consider the vocational expert's testimony at the hearing indicating no jobs existed for an individual with Mr. Criss' limitations. (Pl.'s Br. at 1). Defendant argues that ALJ properly considered Dr. Holan's testimony regarding the general treatment of edema and generally the frequency of urination related thereto and determined that with regard to Plaintiff these limitations were not credible. (Def.'s Br. at 11-13). Additionally, Defendant argues that the ALJ properly relied on the VE's testimony to the extent that edema and frequent urination were not credible limitations to the degree Plaintiff alleged based on the record as a whole. (Id.).

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1) (2011). First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record. (Id.). In the present case, the undersigned finds that the ALJ properly followed the two-step process when

determining that Plaintiff is not entirely credible. (R. 25).

### a. Does an impairment exists that is capable of causing the degree and type of pain alleged?

Initially, the ALJ noted that "symptoms, such as edema, low back pain, and dyspnea, are not medically determinable impairments." (R. 20). "Impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. (See, 20 CFR 416.908 and 416.929)." (Id.). The ALJ determined that "[w]hile the claimant may have some medically determinable impairments that could reasonably be expected to cause some of symptoms alleged, his statement concerning the intensity, persistence and limiting effects of these symptoms are not wholly credible for the reasons explained in this decision." (R. 21).

### b. Were the claimant's subjective allegations of pain credible in light of the entire record?

Social Security Ruling 96-7p[4] sets out several factors for an ALJ to use when assessing the credibility of a claimant's subjective symptoms and limitations, including:

1.    The individual's daily activities;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, the individual receives or has

---

[4] On March 16, 2016, SSR 96-7p was superseded by SSR 16-3p. Nevertheless, because SSR 16-3p was not issued until after the date of the ALJ's decision, the undersigned will review whether the ALJ's decision comports with SSR 96-7p, the ruling that was applicable at the date of the ALJ's decision.

received for relief of pain or other symptoms;

6.     Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for [fifteen] to [twenty] minutes every hour, or sleeping on a board), and

7.     Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). An ALJ need not document specific findings as to each factor. <u>Wolfe v. Colvin</u>, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. <u>Shively</u>, 739 F.2d at 989-90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." <u>Ryan v. Astrue</u>, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets his or her basic duty of explanation, then "an ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was 'patently wrong.'" <u>Sencindiver v. Astrue</u>, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000)).

### 1.     Factor One: Plaintiff's Daily Activities

The ALJ considered Plaintiff's daily activities noting that Plaintiff was independent in living and personal care. (R. 21). Plaintiff "prepared meals, performed various

household chores, went out regularly including alone, shopped in stores, socialized with friend(s) and family and at times engaged in hobbies such as fishing and hunting." (Id.).

### 2. Factors Two and Three: Plaintiff's Pain and Other Symptoms

The ALJ also reviewed the location, duration, frequency and intensity of Plaintiff's pain and other symptoms (factor two) and the factors that precipitate and aggravate those symptoms (factor three). Regarding Plaintiff's symptoms, the ALJ noted that Plaintiff's Adult Function Reports "raised symptomatology such as difficulty breathing with exertion, back and buttock pain, legs swelling, chest pain, and fatigue." (R. 20). Plaintiff also alleged in the same reports "in terms of functionality, a general contention of difficulty with lifting, squatting, bending, standing, reaching sitting, walking , kneeling, climbing stairs, memory, concentration, understanding, following instructions and completing tasks was raised." (Id.). The ALJ noted that "nearly every possible function listed in a function report was asserted which seems somewhat unrealistic, in addition to being inconsistent with the objective evidence of record . . . ." (Id.).

The ALJ specifically noted that "[a] contention of urination every 15 minutes was wholly inconsistent with and unsupported by the objective evidence of record, as well as unsupported by the claimant's reports to treating and examining sources during the period at issue." (R. 21). Additionally, the ALJ noted that "claimant contended he had to elevate his feet for four hours a day" and that he occasionally wore compression socks. (Id.). Yet, the ALJ notes that Plaintiff has remained independent in living. (Id.). He prepared meals, performed various household chores, such as cleaning and dishes, operated a riding lawn mower to mow grass, gardened for periods of fifteen to twenty minutes at a time and engaged in buying and selling of items. (Id.).

### 3.    Factor Four: Plaintiff's Medications

The ALJ generally discussed the medication that Plaintiff is prescribed for his symptoms (factor four). For example, the ALJ recorded that Plaintiff has been prescribed a nebulizer but was not required to have portable supplemental oxygen. (R. 23). The ALJ further noted that the medical records reflect Plaintiff's hypertension was controlled with conservative pharmacological management. (R. 21). The ALJ found that "[f]ollowing pacemaker insertion and continuing through the period at issue, general practitioner records were remarkable for no more than rare impairment exacerbation, such as some diffuse wheezing and course breath sounds in conjunction with an acute COPD exacerbation." (Id.).

### 4.    Factors Five and Six: Other Treatment and Measures Used to Relieve Symptoms

Next, the ALJ reviewed treatment other than medication that Plaintiff has received for relief of his symptoms (factor five) as well as measures Plaintiff uses to relieve his symptoms on his own (factor six). Plaintiff contends that he elevates his feet four hours a day for his edema and that he occasionally wears compression socks. However, the ALJ noted:

> It was only during said acute exacerbation that recommendation for the claimant to keep his feet elevated, in addition to rest was suggested; subsequent visits at which time no exacerbation was evidenced were absent of any such continuing recommendation, let alone permanent restriction. In terms of clinical findings, peripheral edema remained episodic, with improvement noted over time, and with edema overall never more than mild to moderate in nature.

(R. 22).[5]

---

[5] Additionally, at least one of Plaintiff's health care providers recommended the best plan for reducing his edema would be to lose weight, reduce his sodium intake, wear compression stockings and elevate his feet instead of taking diuretic medication. (R. 548). Further, the

### 5.      Factor Seven: Objective Findings

Another factor that the ALJ considered was the objective findings (factor seven) of record. While discussing the treatment notes comprising the record, the ALJ documented that the objective findings contained in the notes do not support the extreme limitations alleged. (R. 24). For example, the ALJ noted that the claimant's treatment regimen was routine, conservative and since pacemaker insertion, non-aggressive in nature. (Id.). Specifically, the ALJ found that "[t]he treatment records failed to support any assertion of total incapacity since September 18, 2012 . . . ." (Id.). Further, "treatment was relatively routine and conservative, and evidenced to have improved, stabilized and/or alleviated symptomatology." (R. 25).

Plaintiff argues that the record contains substantial evidence that Plaintiff must elevate his feet above heart due to peripheral edema and that Mr. Criss must frequently use the restroom due to the use of diuretic medication. The ALJ could not find substantial evidence to support these contentions nor can the undersigned. Plaintiff does not cite to any evidence that Plaintiff must use the restroom frequently due to the use of diuretic medication. In fact, Plaintiff did not allege this as a limitation in either of his Adult Function Reports. (R. 214-221; 235-242).

As for the alleged edema, Plaintiff cites only a few places in the record where elevation of feet was recommended. First is an appointment at Shinnston Medical Center on December 17, 2012, in which Plaintiff presented as a walk in patient for possible lung infection. (R. 555). He received a nebulizer treatment at the clinic,

---

medical records indicate that Plaintiff only wore his compression stockings occasionally and that he did not lose weight but has remained obese.

injections, prescription medicine for ten days and a cough expectorant with codeine. (Id.). Additionally, he was instructed to "rest and make sure that he keeps his feet elevated." (Id.).

The second reference Plaintiff makes to elevating feet as a recommendation for his edema in the record as a checkup at Shinnston Medical Center on February 14, 2013. (R. 548). PAC Hess noted in his objective text: "General: A well-appearing, alert, man in no acute distress. Cardiovascular: No bruits. Heart: Regular rate and rhythm. Lungs: Clear to auscultation bilaterally. Extremities: Mild Pitting edema in the lower legs." Dr. Hess's assessment was:

> 3. Venous insufficiency. This has been bothering him. I told him that I just do not feel comfortable to keep pushing the diuretics and the best thing he could do would be to **become more active and watch his sodium intake** while keeping the legs elevated. I encouraged him to wear the support hose as much as possible.

(R. 548, emphasis added).

Therefore, the ALJ's determination that "[i]n terms of clinical findings, peripheral edema remained episodic, with improvement noted over time, and with edema overall never more than mild to moderate in nature" appears to be substantially supported by the evidence. After a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is sufficiently specific to make clear his reasoning in finding Plaintiff not entirely credible. Thus, the burden was on Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed to meet this burden. Consequently, the undersigned accords the ALJ's credibility determination the great weight to which it is entitled.

**2.    The ALJ properly assessed the testimony of both the medical expert and vocational expert that testified at the hearing.**

**Medical Expert at Hearing**

An ALJ must "weigh and evaluate every medical opinion in the record." Monroe v. Comm'r of Soc. Sec., No. 1:14CV48, 2015 WL 4477712, at *7 (N.D. W. Va. July 22, 2015). When weighing and evaluating these opinions, ALJs often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the claimant and has a treatment relationship with the claimant. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005). However, this "treating physician rule . . . does not require that the [treating physician's] testimony be given controlling weight." Anderson v. Comm'r, Soc. Sec., 127 F. App'x. 96, 97 (4th Cir. 2005). Therefore, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, [then] it should be accorded significantly less weight." Id.

When evaluating medical opinions that are not entitled to controlling weight, the ALJ must consider the following non-exclusive list: (1) whether the physician has examined the claimant; (2) the treatment relationship between the physician and the claimant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; (5) whether the physician is a specialist and (6) any other factor that tends to support or contradict the opinion. 20 C.F.R. § 404.1527 (2005). However, the ALJ need not explicitly "recount the details of th[e] analysis [of these factors] in the written opinion." Fluharty v. Colvin, No. CV 2:14-25655, 2015 WL 5476145, at *12 (S.D. W. Va. Sept. 17, 2015). Instead, an ALJ need only "give 'good reasons' in the decision for the weight ultimately allocated to medical source opinions." Id. (quoting 20 C.F.R. § 404.1527(d)(2)). In this regard, Social Security Ruling 96–2p provides that those

decisions "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Keeping these rules in mind, the undersigned will examine the ALJ's evaluation of Dr. Holan's medical opinions.

Dr. Holan was the medical expert who testified at the hearing on October 4, 2014, before the ALJ. In preparation for the hearing, Dr. Holan read the file regarding Plaintiff's medical condition in order to form an opinion about the nature and severity of the claimant's impairments during the relevant time period. (R. 38.). Dr. Holan considered the following impairments: chronic pulmonary insufficiency (3.02), including sleeping disorders (3.10), cardiac arrhythmia (4.05), peripheral neuropathy (11.14), hearing impairments (2.08). Further, Dr. Holan testified that Plaintiff does not meet the listings for any of these impairments. Dr. Holan reviewed the following impairments when assessing Plaintiff's functional limitations and restrictions: COPD, obstructive sleep apnea, obesity, hearing loss, peripheral neuropathy, heart arrhythmia-pace maker, hypertension, hyperlipidemia and Type II diabetes. After reviewing the medical records and these specific impairments, Dr. Holman opined that Plaintiff could:

> [O]ccasionally lift and carry 20 pounds maximum, frequently lift and carry 10 pounds, stand and walk for six hours, sit for six hours, and no limitations pushing and pulling other than the exertional limitation imposed by the 20 pound weight limit. Postural limitations, he would be able to occasionally climb ramps and stairs, never climb ropes, ladders, or scaffolds, occasionally balance, occasionally stoop, occasionally crouch, and occasionally crawl. There would be no manipulative, visual, or communicative limitations. Environmental limitations would include avoiding concentrated exposure to temperature extremes, pulmonary irritants and noise.

(R. 41). Dr. Holan further opined that Plaintiff would be able to function in a normal

office environment and that he did not require the use of an assistive device for standing and walking. (R. 42).

On cross-examination, Plaintiff's attorney noted that Dr. Holan had never examined Plaintiff but had only reviewed his medical records. (R. 43). Plaintiff's attorney then proceeded to ask Dr. Holan whether it is common for treating physicians to prescribe elevating feet to treat peripheral edema and asked how high the legs have to be elevated. Dr. Holan testified that it was common and that elevation of legs should be above the heart. (Id.). Plaintiff's attorney then asked Dr. Holan whether Plaintiff was on a diuretic medication for his edema and whether the purpose of that medication was to increase urination. (R. 44). Dr. Holan testified that Plaintiff was on a diuretic and the purpose was to increase urination to decrease swelling. (Id.).

The ALJ then re-examined Dr. Holan asking specifically how frequently the medication would cause an individual to urinate. (R. 45). Dr. Holan responded that "[g]enerally speaking, once the medication officially started, it's fairly frequent. But after taking it for just a short time, the individual would become more or less used to taking it, and the body won't react the same way." (Id.). The body would get used to the medication in several weeks. (Id.). Dr. Holan further testified that "[t]he total amount of urine output in a 24 hour period would probably be slightly more than if he wasn't taking the diuretic. But he wouldn't have the extreme urgency to pass urine, as when he first started taking the medication." (R. 46). There was further testimony from Dr. Holan upon re-cross examination that different patients respond differently to diuretic medication; however, the Doctor was never presented with the question as to whether Plaintiff's allegation that he has to urinate every fifteen minutes after years of being on the

medication was likely. (R. 47).

Likewise, regarding the edema, the cross-examination questions were in general terms not specific as to Plaintiff. Plaintiff refers to only two places in the medical records where feet elevation was recommended to ease the edema. (See ECF No. 11 at 6, R. 548, 555). Neither specified raising the feet above the heart and neither gave a time period for which elevation was to be done. (Id.). It was clear from the medical records that increased activity and less sodium were the preferred treatments for the edema along with feet elevation when possible. (R. 548). The medical records simply do not support Plaintiff's allegations that he needs to elevate his legs above his heart for four hours per day or that Plaintiff urinates every fifteen minutes.

The ALJ wrote the following about Dr. Holan's testimony in his decision:

> The undersigned considered impartial medical expert Dr. Holan's testimony describing the claimant's impairments and providing an opinion on the impact of impairment on the claimant's functional abilities. Dr. Holan averred that the claimant was capable of a range of light exertional work, such as lifting/carrying 20 pounds occasionally and 10 pounds frequently, standing/walking six hours in a workday and sitting six hours in a workday, having no push/pull limitations. Posturals could be performed occasionally, except no climbing of ladders, ropes or scaffolds. No manipulative, visual, or communicated limitations were required . Concentrated exposure, for example, to temperature extremes, extremely loud noise, and respiratory irritants was suggested. The claimant was capable of work in a normal office environment and there was no medical necessity for use of an assistive device for ambulation objectively evidenced. The undersigned accorded this opinion some, but not controlling weight. Although a non-examining and non-treating source, the opinion was consistent with and supported by the objective record, and further bolstered by the opinions of State agency medical consultant experts.

(R. 25).

Dr. Holan provided his opinion on the impact of impairment on the claimant's functional abilities, which the ALJ then used as his hypothetical for the Vocational

Expert. The ALJ properly assessed Dr. Holan's testimony and explained the weight given to his opinion.

**Vocational Expert at Hearing**

While "questions posed to [a] vocational expert must fairly set out all of the claimant's impairments, the question[s] need only reflect those impairments supported by the record." Russell v. Barnhart, 58 F. App'x. 25, 30 (4th Cir. 2003). The Commissioner may not rely upon the answer to a hypothetical question if the question fails to fit the facts on record. See Swaim v. Califano, 599 F.2d 1309 (4th Cir. 1979). Importantly, an ALJ does not make a finding of fact by presenting a hypothetical question to a vocational expert and may properly ask a vocational expert alternative hypothetical questions. Davis v. Apfel, 162 F.3d 1154 (4th Cir. 1998).

Plaintiff asserts that Dr. Ostrowski, the VE, testified that if Plaintiff had to take restroom breaks every fifteen minutes and had to elevate his feet above his heart during the work day, then there would be no jobs available. (R. 73). However, the ALJ found that Plaintiff's allegations as to the amount of feet elevation and the frequency of urination were not credible. Therefore, the ALJ did not include those limitations in his RFC that was presented to the Vocational Expert.

The undersigned finds that the ALJ properly assessed the testimony of both the medical expert and vocational expert that testified at the hearing and that substantial evidence supports the ALJ's assessment.

**3.   The ALJ determined that the alleged severity of Plaintiff's Edema and Frequent Urination were not credible and therefore were not limitations that should be considered in the RFC.**

Plaintiff argues that the ALJ did consider that "Mr. Criss must elevate his feet above his heart level due to peripheral edema and that Mr. Criss must frequently use the restroom due to his diuretic medication" when assessing Plaintiff's limitations in his RFC. Pl.'s Br., ECF No. 11 at 6. Defendant argues that substantial evidence supports the ALJ's RFC determination, in which the ALJ fully accounted for all of Plaintiff's credibly established functional limitations. Def.'s Br., ECF No. 13 at 1.

The "ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact." Farnsworth v. Astrue, 604 F. Supp. 2d 828, 857 (N.D. W. Va. 2009); see also 20 C.F.R. § 416.946 (2011). When performing an RFC assessment, an ALJ "must first identify the [claimant's] functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the claimant's physical abilities, mental abilities and "other work-related abilities." Williams v. Comm'r of Soc. Sec., No. 3:14-CV-24, 2015 WL 2354563, at *4 (N.D. W. Va. May 15, 2015). After the ALJ completes this "function-by-function analysis[,] . . . he [may] express the RFC in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Id. The RFC "assessment must [then] include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Id.

In the present case, the undersigned finds that the ALJ sufficiently discussed his reasoning for the RFC determination. Initially, the ALJ identified Plaintiff's symptoms and limitations (R. 20) before analyzing Plaintiff's work-related abilities on a function-by-

function basis. Specifically, the ALJ determined that "symptoms, such as edema, low back pain, and dyspnea, are not medically determinable impairments. Impairment must result from anatomical physiological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." (R. 20). The ALJ specifically found that "[a] contention of urination every 15 minutes was wholly inconsistent with and unsupported by the objective evidence of record, as well as unsupported by the claimant's reports to treating and examining sources during the period at issue." (R. 21). After reviewing the record, the undersigned finds that the ALJ's credibility determination as to the frequent urination issue is supported by substantial evidence and the ALJ applied the proper legal standards in making this determination. The medical records are devoid of any complaints by Plaintiff of frequent urination as a side effect of his diuretic medication.

Likewise, although there is some evidence of leg swelling throughout the medical records, the degree of swelling to which Plaintiff complains and the alleged effect on his ability to work are not credible. The ALJ made the following finding concerning Plaintiff's allegation that he has to elevate his feet above his heart for four hours a day:

> It was only during said acute exacerbation that recommendation for the claimant to keep his feet elevated, in addition to rest was suggested: subsequent visits at which time no exacerbation was evidenced were absent of any such continuing recommendation, let alone permanent restriction. In terms of clinical findings, peripheral edema remained episodic, with improvement noted over time, and with edema overall never more than mild to moderate in nature.

(R. 22). After reviewing the record, the undersigned finds that the ALJ's credibility determination as to severity of Plaintiff's edema is supported by substantial evidence and that the ALJ applied the proper legal standards in making this determination.

Therefore, the ALJ properly excluded the two alleged limitations of elevating the feet above the heart four hours per day and urination every fifteen minute from the RFC. Those alleged limitations were not supported by the evidence of record and were not credible limitations. Accordingly, the undersigned finds that the ALJ's RFC determination is supported by substantial evidence.

## VII.　RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's applications for SSI benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 12) be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 17th day of May, 2017.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE